**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SHANE E. WAGSTER,

                                 CASE NO. 2:17-cv-12900

           *Plaintiff*,         DISTRICT JUDGE GEORGE CARAM STEEH

                                 MAGISTRATE JUDGE PATRICIA T. MORRIS

*v*.

COMMISSIONER OF SOCIAL SECURITY,

          *Defendant*.

_____/

## REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 16)

## I.      RECOMMENDATION

      In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff Shane Wagster is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 14), be **DENIED**, that the Commissioner's Motion, (Doc. 16), be **GRANTED**, and that this case be **AFFIRMED.**

## II.      REPORT

### A. Introduction and Procedural History

      This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff's claims for Social Security Supplemental Insurance benefits ("SSI") under Title XVI, 42 U.S.C. §§ 1381-1383f, and for Disability Insurance Benefits ("DIB") under Title II, 42 U.S.C. § 401 *et seq*. (Doc. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was

referred to the undersigned Magistrate Judge. (Doc. 4). The matter is currently before the court on cross-motions for summary judgment. (Docs. 14, 16).

Plaintiff filed for DIB and SSI on June 12, 2014, alleging disability beginning May 18, 2014. (PageID.58). Plaintiff was born on May 18, 1970. (PageID.213). An initial denial for both claims issued on October 21, 2014. (PageID.58). At Plaintiff's request, an administrative hearing was held on May 18, 2016, before Administrative Law Judge ("ALJ") Kevin W. Fallis. (PageID.78-116). Several months later, the ALJ issued a decision denying Plaintiff's claims. (PageID.55-77). In June 2017, the Appeals Council denied Plaintiff's request for review. (PageID 36-42).[1] This action followed.

### B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as

---

[1] Plaintiff submitted an additional piece of evidence to the Appeals Council: a third-party statement. (PageID.46-47). In the Sixth Circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the ALJ level, any "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision—the final decision of the Commissioner—the court can consider only evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial-evidence review.

adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

3

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity ["RFC"] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered the claimant unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis

reaches the fifth step. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

At the fifth step, the Commissioner is required to show that "other jobs in significant

numbers exist in the national economy that [the claimant] could perform given [his or]

her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20

C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ concluded that Plaintiff had

not been disabled under the Social Security Act from May 18, 2014, through the date of

the decision, August 2, 2016. (PageID.72-73). At step one, the ALJ found that Plaintiff

had not engaged in substantial gainful activity since his alleged onset date of May 18,

2014. (PageID.60). Next, the ALJ determined that Plaintiff had the following severe

impairments: degenerative disc disease of the cervical and lumbar spines, carpal tunnel

syndrome, degenerative joint disease of the right shoulder and hips, cervicalgia,

headache, traumatic brain injury, adjustment disorder, alcohol use disorder in early

remission, and cocaine use disorder in full remission. (*Id.*). Additionally, he had the non-

severe impairment of hearing loss. (PageID.61). At step three, the ALJ observed that

Plaintiff did not have an impairment or combination of impairments that met or medically

equaled the severity of a listed impairment. (*Id.*). Next, the ALJ found Plaintiff had the

RFC to

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)
> except a sit/stand option, allowing the opportunity to sit or stand
> alternatively provided this person is not off task more than 10% of the work
> period; occasional pushing and pulling; occasional operation of foot
> controls; never climbing ladders, rope, or scaffolds, occasional climbing of

ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; occasional overhead reaching, frequent handling of objects and fingering; and must avoid even moderate exposure to excessive noise and use of hazardous moving machinery, avoid all exposure to excessive vibration and unprotected heights. Limited to occupations which do not require complex written or verbal communication; work is limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions and routine workplace changes; and only occasional and superficial interaction with the public.

(PageID.63). Moving to step four, the ALJ found Plaintiff unable to perform any past relevant work. (PageID.71). Finally, at step five, the ALJ concluded that jobs existed in significant numbers in the national economy that Plaintiff could perform. (*Id.*).

### E. Administrative Record

#### 1. Medical Evidence

The court has thoroughly reviewed Plaintiff's medical record. In lieu of summarizing his medical history here, the court will make reference and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2. Plaintiff's Function Report

Plaintiff completed a function report on August 21, 2014. (PageID.258-270). At the time, Plaintiff lived in a house with friends. (PageID.258). On an average day, he would wake up, shower, eat, and go to doctor's appointments or physical therapy. (PageID.259). He took care of his daughter, of whom he had guardianship, and made sure she ate, dressed, showered, and so on. (*Id.*). He indicated he had no problem with personal care, including dressing, bathing, caring for his hair, shaving, feeding himself, or using the toilet. (*Id.*). He did not need any special reminders to take care of personal

needs or grooming, but did need reminders to take his medicine. (PageID.260). He was able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (PageID.261). For breakfast, he could prepare himself a bowl of cereal or toast, though he "use[d] to be able to cook and doctors won't let [him] now." (PageID.260). Nor could he do household chores, at least without help and supervision—"[d]octors won't let [him] do anything yet for fear of seizures." (*Id.*). Further, Plaintiff reported that he could no longer participate in any of his hobbies, including working on cars, riding motorcycles, horseshoes, car racing, camping, hunting, and water sports. (PageID.262).

Plaintiff went outside daily. (PageID.261). He could ride in a car but reported that doctors would not allow him to drive and "would prefer [him] to have someone with [him] at all times." (*Id.*). He also needed reminders and company when going places. (PageID.262). He did not shop. (PageID.261) He spent time talking with others every day, and he got along well with family, friends, neighbors, and others. (PageID.262–223). He respected authority figures and had never been fired or laid off from a job because of problems getting along with other people. (PageID.264).

Plaintiff explained that his ability to work was limited for several reasons: doctors had warned him that if he hit his head again, he could "knock [him]self into a vegetative state," and he was "prone" to hitting his head as a professional mechanic; his back made it difficult to lift, bend, and stretch; and he was concerned that he could put a customer in danger if he forgot a part due to his memory problems. (PageID.258). Later in the report, when asked whether he had noticed any unusual behavior or fears, he responded: "Fear of hitting my head, fear of not doing right or fear of seizures." (PageID.264).

Plaintiff selected the following when prompted to mark which abilities his illnesses, injuries, or conditions affected: lifting, squatting, bending, standing, reaching, kneeling, hearing, stair climbing, memory, completing tasks, concentration, understanding, following instructions, and using hands. (PageID.263). He explained: "I have to be careful not to hit my head since this is my [third] brain injury, dizzy, headaches, aches, pains, and off balance." (*Id.*). On a "good day," he could walk two to three blocks before needing to rest for fifteen to twenty minutes to catch his balance and breath. (*Id.*). By Plaintiff's estimate, he could pay attention for ten to fifteen minutes at a time. (*Id.*). He could not finish what he started. (*Id.*). Written instructions he could follow "ok," but spoken instructions he could not because he would forget or become upset when he could not understand. (*Id.*). In general, stress made him upset or aggravated. (PageID.264). His sleep had also suffered as a result of his illnesses, injuries, or conditions, causing him discomfort so he was "up and down all night." (PageID.259).

Finally, he complained that the medicine Indocin had the side effect of causing him an upset stomach. (PageID.265).

### 3.   Administrative Hearing

#### a.  Plaintiff's Testimony

An administrative hearing was held in Plaintiff's case on May 18, 2016, before ALJ Kevin W. Fallis, (PageID.78-116), at which Plaintiff testified. (PageID.85-108). Plaintiff's girlfriend, Tammy Roberts, was present but did not testify. (PageID.83-84).

Plaintiff testified that he had completed eighth grade in high school, then dropped out in ninth; he went on to earn his GED. (PageID.87). In the nineties, he had worked

8

installing siding on homes, before starting work as a certified mechanic in 2000. (PageID.109). He had worked as a mechanic for thirteen or fourteen years, (PageID.110), until his motorcycle accident in May 2014, (PageID.88-89). At times, his work had required him to lift over 100 pounds. (PageID.110).

Plaintiff believed the main obstacles keeping him from working full-time were his back and neck. (PageID.91). Constant back pain had troubled him since September 1990, when he had been hit by a car, and it had worsened with time. (PageID.91-92). The pain traveled "down [his] butt and down . . . [his] right leg." (PageID.93). He rated his daily pain at about a six or seven, with flare-ups that made it difficult to move. (PageID.92). His neck pain began at the time of his motorcycle accident, and was also constant and worsening. (PageID.92-93). From his neck, the pain radiated into his right shoulder and also caused him daily headaches. (PageID.93). He rated the headaches at a five on a pain scale of ten. (PageID.93-94).

In addition to his back and neck pain, Plaintiff described several other physical impairments. He had to wear boots "all the time" to deal with pain from breaking his ankles "a few times" and his foot in the motorcycle accident. (PageID.94). He had broken his left pinky finger in 2010 or 2011; he had returned to work as a mechanic after it healed. (PageID.99). And four to five times a month he experienced stomach pains for several hours, which he mitigated with water and ginger ale. (PageID.94). The stomach pains had started in September 1990, after his spleen was removed. (PageID.94-95).

His pain was helped by "constantly" changing positions, resting throughout the day, medication, and sometimes ice or heat. (PageID.105). His medication caused the

side effects of constipation, for which he ate prunes, and an "eating disorder where days I don't eat." (PageID.90-91). Plaintiff described how his weight fluctuated between 175 pounds and 190 pounds because he sometimes did not feel like eating; he weighed 180 pounds at the time of the hearing. (PageID.86).

Plaintiff testified that his limited hearing also prevented him from working. (PageID.95-96). He was deaf in his left ear and had had "very little hearing" since he was hit by a car in 1990. (PageID.96). After the insurance company stopped paying for his treatment—which included the insertion of glass tubes into his ears—he could not afford to continue seeing the doctor. (PageID.96-97). His hearing loss caused him to miss or misunderstand what people said, and in a noisy environment, he would "be stressing to hear" the speaker. (PageID.97).

The ALJ noted that Plaintiff had been rocking back and forth in his seat throughout the hearing and had stood up once. (PageID.98). Plaintiff estimated he could sit twenty to twenty-five minutes before needing to get up and move around, and could stand for about fifteen to twenty minutes before needing to sit. (*Id.*). He could walk for about half an hour or forty-five minutes before needing to rest. (PageID.98-99). He testified that he could not lift a gallon of milk—which the ALJ estimated to weigh about eight or nine pounds—for two to three hours a day, five days a week. (PageID.98).

In addition to his physical impairments, Plaintiff stated that he had suffered from anxiety since May 2014. (PageID.95). Anxiety struck "[j]ust out of the blue," he said, such as at doctor's appointments and surgeries or when he experienced pain. (*Id.*). Some days were worse than others. (*Id.*). Plaintiff also reported that he had problems with his

10

memory that had been exacerbated since the accident. (PageID.98). For example, he sometimes forgot where he was going or to take his medication. (PageID.106-107).

Plaintiff explained that he spent most of his time at his girlfriend's house, though at times he stayed with a friend or his brother instead. (PageID.85). When Plaintiff was staying at his girlfriend's house, she helped him with the cooking, did the laundry, dishes, and household chores, and took him to his doctor's appointments and surgeries. (PageID.106).  Plaintiff did not do chores; he had broken dishes when trying to wash them and left the stove on after cooking for himself, and could not carry the laundry basket up and down the stairs. (PageID.100).

He was able to shower, but found it difficult. (*Id.*). He used a computer 'very little" and used Facebook on his phone. (PageID.101). Previously, he had enjoyed riding motorcycles, playing darts, working on cars, and building hotrods, but he was no longer able to. (*Id.*). Instead, he watched TV; he could follow shows if he was "into them." (*Id.*). He could not focus on reading. (*Id.*). Additionally, he described himself as lacking "people skills"; he had previously struggled when dealing with customers face-to-face because "people would ask for more than [he] could do and . . . [i]t was aggravating to try and get through to them." (PageID.102).

Plaintiff did have his driver's license and estimated he drove every couple days. (PageID.86-87). The longest he would drive was about twenty minutes, with no problems except that he was "always moving in [his] seat" due to his back. (PageID.87). He went out to eat about once a month. (PageID.101-102).

He had some difficulty sleeping, for which he took Seroquel. (PageID.103). Each night he got four to six hours of "broken" sleep, during which was awoken by his back pain, anxiety, or need to use the restroom. (*Id.*). During the day, he took a couple of fifteen- to twenty-minute naps. (*Id.*).

Lastly, Plaintiff testified about his substance use. He has avoided alcohol since his birthday in 2014. (*Id.*). He had used cocaine in the past, but again, not since his birthday in 2014. (PageID.103-104). He had been impaired at the time of the May 2014 motorcycle accident. (PageID.104). Plaintiff testified that he had his medical marijuana card and "abuse[d] marijuana now." (*Id.*). Additionally, he smoked half of a pack of cigarettes every day. (PageID.103).

### b.  The Vocational Expert's Testimony

Vocational Expert ("VE") Stephanie Leach also testified at the administrative hearing. (PageID.108-114). To begin, the ALJ explained that Plaintiff's past work as a siding installer in the nineties was outside the relevant time period. (PageID.110). Thus, Plaintiff's job as a mechanic was his only past relevant work. (*Id.*).

The ALJ then posed his first hypothetical: A person with Plaintiff's age, education, and work experience who was

> limited to light work. This individual would be allowed to sit or stand alternatively, provided they weren't off task more than 10% of the work period. This individual could occasionally perform pushing and pulling. Could occasionally operate foot controls. They could never climb ladders, ropes, or scaffolds. They could occasionally climb ramps or stairs. Occasionally balance, stoop, kneel, crouch, and crawl. They could perform occasional overhead reaching. They would be limited to frequent handling of object[]s and fingering bilaterally. They would have to avoid all exposure to excessive vibration. They would have to avoid even moderate

12

use of hazardous moving machinery. They would have to avoid all exposure to unprotected heights. . . . [A]void even moderate exposure to excessive noise. This individual would be limited to occupations[] which did not require complex written or verbal communication. Additionally, this work is limited to simple, routine, repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work related decisions, routine workplace changes. There could only be occasional and superficial interaction with the public.

(PageID.111-112). The VE testified that this hypothetical person could not do Plaintiff's past work, but that the person could perform other work, including some unskilled office work positions (reduced to 200,000 jobs nationally); a reduced range of packer positions (200,000 nationally); and a reduced range of inspector positions (80,000 nationally). (PageID.112-113).

Hypothetical two incorporated all the limitations of the previous hypothetical and also limited the person to sedentary work. (PageID.113). The VE responded that this hypothetical person would have available a reduced range of unskilled office clerk positions (50,000 nationally); a reduced range of packer positions (18,000 nationally); and a reduced range of inspector positions (10,000 nationally). (*Id.*).

For hypothetical three, the ALJ described a person who would be off-task twenty percent of the day in addition to his or her regularly scheduled breaks. (*Id.*). No jobs would be available for such a person, said the VE. (PageID.113-114).

Lastly, the ALJ posed his fourth hypothetical, which asked the VE to assume that due to the person's doctor visits, symptoms, and side effects from medication, he or she would be absent from work for two workdays per month. (PageID.114). Again, the VE testified that no jobs would be available for such a person, regardless of why he was off

13

task or missed days of work. (*Id.*). The VE concluded her testimony by clarifying that her testimony as to absenteeism, time off-task, proximity to others, fast-paced production, pacing, sitting and standing, and overhead reaching versus other types of reaching were based not on the Dictionary of Occupational Titles, but on her professional experience. (*Id.*).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the

Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). The ALJ must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540–42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1–2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1–2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets

15

or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640–41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

### G. Analysis

Plaintiff argues that the ALJ's opinion was not supported by substantial evidence because the ALJ "failed to comply with the treating physician rule" in evaluating Dr. Roome's opinion. (Doc. 14 at PageID.1704).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2)[2]; *see also Wilson*, 378 F.3d at 544. The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640–41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

Dr. Roome completed a Physical RFC Questionnaire for Plaintiff on April 4, 2016, almost two years after his May 2014 motorcycle accident. (PageID.1685-1688). At that time, he had been seeing Plaintiff for seven months. (PageID.1685). He diagnosed Plaintiff with neck pain, back pain, and a closed head injury, and found his prognosis "good." (*Id.*). He reported Plaintiff's symptoms to be neck pain, back pain, and memory loss. (*Id.*). Describing the clinical findings and objective signs supported his diagnosis,

---

[2] For claims filed on or after March 27, 2017, the rules in § 404.1520c apply instead of those in 20 C.F.R. § 404.1527. As Plaintiff's claims were filed on June 12, 2014, (PageID.58), § 404.1527 governs. 20 C.F.R. § 404.1527.

Dr. Roome wrote only, "neck pain/back pain." (*Id.*). Asked to characterize the nature, location, frequency, precipitating factors, and severity of Plaintiff's pain, again, Dr. Roome wrote only "neck pain/back pain." (*Id.*). In the space to describe the treatment and response, including any side effects of medication, he responded: "memory loss [and] persistent neck/back pain." (*Id.*). Further, he indicated that emotional factors contributed to Plaintiff's symptoms and functional limitations, and anxiety affected Plaintiff's physical condition. (PageID.1686).

Dr. Roome estimated Plaintiff would be off-task twenty-five percent or more of a typical workday, and was incapable of even "low stress" jobs. (*Id.*). He did not explain why in the space provided. According to Dr. Roome, Plaintiff could walk one to two city blocks without rest or severe pain. (*Id.*). Asked how long Plaintiff could sit at one time, Dr. Roome circled both thirty minutes and more than two hours; asked how long Plaintiff could stand at one time, he circled both twenty minutes and one hour. (*Id.*). Plaintiff could stand or walk less than two hours total in an eight-hour working day, and sit about two hours. (PageID.1687). He would need to include thirteen-minute periods of walking every ninety minutes. (*Id.*). His job would need to permit shifting positions at will. (*Id.*). Moreover, Plaintiff would need to take fifteen- to twenty-minute unscheduled breaks at times, although Dr. Roome did not indicate how often. (*Id.*). Dr. Roome reported that Plaintiff could never lift ten pounds or more, look down, turn his head right or left, look up, or hold his head in a static position; nor could he ever twist, stoop/bend, crouch/squat, climb ladders, or climb stairs. (PageID.1687-1688). He left blank the question asking whether Plaintiff had significant limitations with reaching, handling, or fingering, but

18

wrote "cannot do" when asked what percentage of a working day Plaintiff could use his hands, fingers, and arms for certain tasks. (PageID.1688). Lastly, he estimated Plaintiff would miss an average of more than four days of work per month. (*Id.*).

The ALJ gave Dr. Roome's opinion little weight for several reasons, including that "it was not supported by Dr. Roome's multiple examinations of the claimant, which were noted to be mostly within normal limits (specifically, all psychological examinations noted normal mood, affect, concentration, and attention span)." (PageID.70), referencing (PageID.1638, 1649, 1658, 1669). [3]

Plaintiff is unsatisfied with this explanation. He argues that because Dr. Roome treated his physical impairments, his mental examinations are irrelevant and cannot constitute a good reason for dismissing his opinion. (Doc. 14 at PageID.1706-1707). Yet at each appointment Dr. Roome evaluated Plaintiff's mental status and found it normal; he assessed Plaintiff with bipolar disorder; and he prescribed psychiatric medications, including Abilify and Seroquel. (PageID.1638-1639, 1649-1650, 1658-1659, 1669). And in his "Physical [RFC] Questionnaire," Dr. Roome opined that emotional factors contributed to the severity of Plaintiff's symptoms, and that Plaintiff had anxiety that affected his physical condition. (Doc. 16 at PageID.1727). Thus, I suggest that it was not

[3] It does not escape me that such an internal inconsistency is "properly [considered] only after the ALJ has determined that a treating-source opinion will not be given controlling weight." *Gayheart v. Comm'r of Soc. Sec..*, 710 F.3d 365, 376 (6th Cir. 2013). But the ALJ also recognized, as I explain immediately below, that Dr. Roome's opinion was inconsistent with "objective testing and opinions of medical professionals." (PageID.70). Thus, I suggest that to the extent the ALJ erred in failing to specify why Dr. Roome's opinion did not deserve controlling weight *before* expounding on this factor, the rest of his discussion renders that error harmless. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 541, 551 (6th Cir. 2010) ("Thus the procedural rule is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.").

improper for the ALJ to consider conflicts between Dr. Roome's opinion and his treatment notes on Plaintiff's mental state when weighing the doctor's opinion.

Nor was that the only reason the ALJ disregarded Dr. Roome's opinion. "Further," the ALJ continued, Dr. Roome's opinion "is inconsistent with objective testing and opinions of other medical professionals." (PageID.70). Plaintiff dismisses the ALJ's second reason as "conclusory" and emphasizes the lack of a supporting citation to the record. (Doc. 14 at PageID.1707). But even where an ALJ uses "somewhat formulaic and non-specific language to explain [the] decision to accord only 'limited weight' to [an RFC] assessment . . . this explanation must be viewed against the backdrop of 'a[n] exhaustive . . . discussion of the treating records' that preceded it." *Fifer v. Comm'r of Soc. Sec.*, No. 14-14584, 2016 WL 1399254, at *3 (E.D. Mich. Apr. 11, 2016) (citation omitted); *see also Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008) ("Unlike the cases where we have held that the ALJ failed to state 'good reasons' for rejecting the treating physician's opinion, here the ALJ did not merely cast aside the treating physician's opinion without explanation."). Here, the ALJ discussed the record— which numbers more than 1,500 pages—at great length, (PageID.61-70), and specifically noted earlier in his opinion that Plaintiff's "doctors' objective findings indicated functional testing was within normal limits, there was no deficit, and his mood, affect, concentration, and attention span were all normal." (PageID.69) (citing PageID.1048-1061, 1602-1615, 1627-1675).

For example, in October 2014, Dr. Nael Tarakji at Flint Neurological Centre evaluated Plaintiff for his headaches. (PageID.1603). On examination, Plaintiff had

20

normal tone, bulk, and muscle strength of all muscle groups at 5/5, deep tendon reflexes at 2+ symmetrically, no cerebellar dysfunction to nose-finger-nose or heel-to-shin, a normal sensory examination, and a normal gait including tiptoe, heel walk, and tandem gait. (*Id.*). He was alert and oriented times three with normal mentation and cognition and normal central language function. (*Id.*).

At appointments in October 2014 and April 2015, at the Insight Institute of Neurosurgery and Neuroscience, Dr. Jawad Shah found Plaintiff alert and oriented times three, with normal speech and mentation. (PageID.1049, 1052). He was alert, interactive, and appropriate. (PageID.1050, 1053). Gait and functional testing were normal. (PageID 1049, 1052).

Further, at his April 2015 appointment, Dr. Shah remarked that an MRI of Plaintiff's brain "look[ed] good." (PageID.1050). He stated: "From my perspective[,] I don't think there is anything further that I would offer," and recommended only that Plaintiff try a website for brain exercises and continue seeing Dr. Tarakji for his headaches. (*Id.*).

At a follow-up visit in May 2015, Dr. Tarakji reported that the examination "revealed no deficit"—though in the next sentence he stated, without explanation, that Plaintiff "has memory and cognitive dysfunction and is not able to work." (PageID.1612). An EMG of Plaintiff's upper extremities on the same date showed no evidence of cervical radiculopathy or diffuse neuropathy, including carpal tunnel syndrome. (PageID.1612-1613).

Moreover, some of the inconsistent objective findings noted by the ALJ were Dr. Roome's own. Though Plaintiff reported lower back and hip pain at every appointment with Dr. Roome, his physical examinations were unremarkable. (PageID.1637-1638, 1649, 1658, 1668). Throughout 2015 and into 2016, Dr. Roome repeatedly observed "normal alignment and mobility" of Plaintiff's extremities, no deformity or scoliosis in his thoracic or lumbar spine, and normal sensation, reflexes, coordination, and muscle strength and tone. (*Id.*). Further, as the ALJ specifically noted, Dr. Roome continually found Plaintiff alert and cooperative, with normal mood and affect, and a normal attention span and concentration. (PageID.1638, 1649, 1658, 1669). Thus, Dr. Roome's own treatment notes and sparse Physical RFC Questionnaire contain little support for the rather extreme limitations he would impose on Plaintiff. *See Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. 2006) ("The ALJ reasoned that Dr. Lin's conclusions are 'not well supported by the overall evidence of record and are inconsistent with other medical evidence of record.' This is a specific reason for not affording controlling weight to Dr. Lin."); *MacNeil v. Astrue*, 908 F. Supp. 2d 259, 266–67 (D. Mass. 2012) (finding the ALJ properly exercised his discretion in assigning treating physician's opinion little weight where the opinion, *inter alia*, provided very little explanation of the evidence relied upon, and was inconsistent with other evidence, including the physician's own treatment notes). For the above reasons, I suggest that the ALJ properly applied the treating physician rule and provided sufficient reasons to afford Dr. Roome's opinion little weight.

A final note: Plaintiff avers that some evidence in the record does support Dr. Roome's limitations. (Doc. 14 at PageID.1707). Specifically, he points to: (1) an October

22

2014 MRI of the cervical spine, (Doc. 14 at PageID.1707) (citing PageID.1078-1079); (2) an August 2015 lumbar spine x-ray showing "severe disc space narrowing with a vacuum disc phenomenon," (Doc. 14 at PageID.1707) (citing PageID.1625); (3) a single physical examination revealing tenderness over the lumbar facets and a "significant" decrease in lumbar spinal flexion and extension, (Doc. 14 at PageID.1707) (citing PageID.1620-1621); and (4) a November 2014 EMG showing denervation of the cervical paraspinal muscles with bilateral carpal tunnel syndrome, (Doc. 14 at PageID.1707) (citing PageID.1608).

Some of this evidence favored by Plaintiff conflicts with other record evidence—for example, the record contains not only the November 2014 EMG showing bilateral carpal tunnel syndrome, but also a May 2015 EMG showing no evidence of carpal tunnel syndrome. *Compare* (PageID.1608), *with* (PageID.1612-1613). It is not for this court, however, to resolve conflicts in the evidence—that is the province of the ALJ alone. So long as the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip*, 25 F.3d at 286 (internal citations omitted).

For all the reasons discussed previously, I suggest that substantial evidence supports the Commissioner's decision, including his evaluation of Dr. Roome's opinion.

### H. Conclusion

For the above reasons, I suggest substantial evidence supports the ALJ's findings and recommend the court **DENY** Plaintiff's Motion for Summary Judgment, (Doc. 14),

**GRANT** Defendant's Motion for Summary Judgment, (Doc. 16), and **AFFIRM** this case.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response

to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 7, 2018                                S/ PATRICIA T. MORRIS
                                                   Patricia T. Morris
                                                   United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: June 7, 2018                                By s/Kristen Castaneda
                                                   Case Manager

25